**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| SHKELQESA DERVISHI | : | |
| | : | |
| | : | CIVIL NO. 3:11CV01018(WWE) |
| v. | : | |
| | : | |
| STAMFORD BOARD of EDUCATION | : | |
| | : | |

RECOMMENDED RULING

This is a case brought by plaintiff, pro se, on behalf of her minor autistic son, T.D., against the Stamford Board of Education ("the Board"). On August 4, 2016, the Court of Appeals issued a Summary Order affirming the District Court's judgment, which upheld an administrative hearing officer's decision denying plaintiff's claims. [Doc. #93]. The Court remanded the case for a determination of reimbursement due plaintiff for the home-based education program provided to T.D. during the pendency of judicial review.[1]

Evidentiary hearings were held on March 16, 22, and 29, 2017. In support of her application, plaintiff filed the Affidavit of Shkelqesa Dervishi dated November 21, 2016 with invoices [Doc. #103, Pl. Ex. 4]; and presented the testimony of Shkelqesa Dervishi, Lucinda Ribeiro, and Dr. Stephanie Bader of

[1] On January 12, 2017, Judge Eginton referred this case to the undersigned for a determination regarding the total value of the home-based program as specified in the 2009 Settlement Agreement for the period described above. [Doc. #107].

the Westchester Institute for Human Development. Defendant filed a Brief Regarding the Calculation of Total Value of Home Program [Doc. #100] and a Reply Brief. [Doc. #105]. Dr. Wayne Holland testified on behalf of the Stamford Board of Education. Post-hearing memoranda were filed on May 31, 2017. [Doc. ##141, 142].

FACTUAL BACKGROUND

A. The 2009 Settlement Agreement

On November 6, 2009, the parties entered into a Settlement Agreement which set forth a plan to have independent consultants evaluate T.D. and recommend an appropriate program for special education and related autism services. [Def. Ex. 500]. The parties agreed to be bound by the recommendations of three independent evaluators regarding an appropriate special education program and placement. Id. ¶1; Hearing Officer's ("H.O.) Dec. at 1, Doc. #81 at 43. In August 2010, an Individualized Education Plan ("IEP") for T.D. for the 2010-2011 school year was finalized which met all components recommended by three independent evaluators. [Summary Judgment Ruling Doc. #89 at 2; H.O. Dec. at 1]. The parents rejected the IEP and requested a due process administrative hearing on November 18, 2010, seeking reimbursement for their home-based program and placement of T.D. at the McCarton School. [H.O. Dec. at 1].

During the implementation of this settlement agreement and the development of T.D.'s program, the Board had agreed to fund T.D.'s home-based program. Paragraph 3 of the Agreement states,

> The Board agrees to reimburse the Parents in the amount of $2,500 per week for the cost of speech, occupational therapy and ABA services and autism consulting services[2] provided to the Student from September 2009 through the development and implementation of the Student's IEP (at the January 2010) PPT meeting. It is the parties' agreement that the Student will be transitioned no later than February 2010 unless the Independent Consultants recommend a different time frame provided that the Student must be transitioned from the home-based program during the 2009-2010 school year.

---

[2] The term "autism consulting services" was a handwritten addition to paragraph three of the Agreement. [Def. Ex. 500]. The Agreement does not define this term; it was added to the sentence listing the Board's reimbursement obligations. Dr. Holland was asked to provide his understanding of the term "autism consulting services" at the hearing. He testified, "it would be a company or an individual that offers services to families and children that are on the autism spectrum." [Tr. 3/29/17 444:5-11].

> THE COURT: And at the time, do you recall any services that were specifically identified under the rubric, as opposed to ABA services for example?
>
> THE WITNESS: No. No I don't. And I bring to your attention also, your Honor, to the fact that this is under the category of the unilateral placement. So this—the language or the type of service would have been directed to us by the family.

Id. at 444:12-21; Tr. 3/29/17 at 481:12-14 (testifying that the Board reimbursed plaintiff for evaluations of T.D. that she initiated; 563:24-564:25 (testifying that reimbursement for "autism consulting services" was for providers selected by plaintiff."). For example, Dr. Holland testified that Dr. Carol Fiorile's services for report writing would be considered "autism consulting services." Id. at 445:2-19 (referencing Pl. Ex. 1 at 5-6).

> Reimbursement for payment shall be made within forty-five ("45") days of the Board's receipt of documentation of payments (invoices and cancelled check(s)) made by the Parents for related services provided to the Student between September 2009 and the development and implementation of the Student's IEP. The Board will further reimburse the Parents for their provision of transportation of the Student to and from his sessions with service providers from September 2009 through the development and implementation of the Student's IEP based on the applicable IRS mileage rate, upon receipt of documentation of the Student's attendance at these sessions during that period. These payments are being made in full and final settlement of all fees, costs and/or damages for any claims relating to the Student's educational program, including compensatory education, through the 2009-2010 school year including the Extended School Year. In consideration of the above payments the Parents agree that they will not seek reimbursement for any additional costs related to the Student's educational program from the Board in any forum through the 2009-2010 school year, including the 2010 Extended School Year. The above payments are expressly conditioned upon the Parents' continued residence in Stamford and the Student's continued attendance at the program selected by the Independent Consultants during the applicable portion of the 2009-2010 school year.

<u>Id.</u> ¶3.

B. <u>Summary Judgment Ruling dated August 5, 2015</u>

In a final decision and order dated May 13, 2011, the Hearing Officer found that the Board offered T.D. an appropriate IEP for the 2010-2011 school year at a Board school and the Board's actions during the 2010-11 school year "did not constitute procedural violations and did not result in a denial of a free appropriate public education" ("FAPE") to T.D. [H.O. Dec. at 19]. The Hearing Officer also found that

> Because the IEP offers an appropriate program in the [least restrictive environment], the Parents are not entitled to reimbursement for any other placement, including reimbursement for their home program and/or the McCarton School, as the IDEA "does not require [a local educational agency] to pay for the cost of education, including special education and related services, of a child with a disability at a private school or facility if that agency made FAPE available to the child and the parents elected to place the child in a private school facility." 34 C.F.R. §300.403(a)(emphasis added).

[H.O. Dec. at 18].

Plaintiff filed this civil action on behalf of T.D. to appeal the hearing officer's May 13, 2011 decision, pursuant to the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. §1415, arguing that the 2010-2011 IEP was not appropriate and that defendant breached the 2009 Settlement Agreement; and challenging the denial of stay-put reimbursement for the home-based schooling. Judge Eginton granted the School Board's motion for summary judgment on August 5, 2015. [Doc. #89].

The Court upheld the Hearing Officer's findings that: the Board complied with the IDEA's procedural safeguards; the 2010-2011 IEP was appropriate; and the Board did not breach the 2009 Settlement Agreement. Id. at 12. The Court further found that the 2009 Settlement Agreement "to reimburse for home-based education [did] not constitute the prior placement for purposes of triggering the stay-put obligation" and that the "Board's contractual duty to reimburse for home-based education ceased

after the Parents rejected the independent consultants' recommended IEP for T.D." Id. at 15 (emphasis added). Instead, the Court found that the "IEP approved by the School Board in August 2010 constitute[d] the current placement for purposes of the stay-put obligation." Id.

C. Summary Order dated August 4, 2016

On August 4, 2016, the Appeals Court vacated the District Court's denial of plaintiff's stay-put claim, finding that on November 18, 2010, when plaintiff sought "administrative review" of the 2010-11 IEP, the "placement 'actually functioning at the time' was the home program that the [Board] had agreed to fund for the previous year" under the 2009 Settlement Agreement. [Doc. #93 at 5]. The Appeals Court also found that "the Board provided T.D. with a FAPE for the 2010-2011 school year" and found "no basis in the record to conclude the Board breached the 2009 settlement agreement." Id. at 4-5.

On remand, the Court of Appeals directed this Court to "(i) calculate the total value of the home program, as specified in the settlement agreement, for the period from November 18, 2010 until the dispute over the 2010-2011 IEP is no longer pending, and (ii) order the Board to pay that amount to Dervishi." [Doc. #93 at 5].[3]

---

[3] The parties agree that the dispute ended with the Appeals Court's issuance of this Summary Order on August 4, 2016. [Doc.

D. Legal Defenses

The Board first argues that reimbursement under the 2009 Settlement Agreement is not warranted because "the Parents refused to enroll the Student in the program selected by the independent consultant." [Doc. #100 at 5]. This argument was squarely addressed on appeal. The Appeals Court vacated the district court's finding on summary judgment that "the School Board's contractual duty to reimburse for home-based education ceased after the Parent's rejected the independent consultants' recommended IEP for T.D." [Doc. #89 at 15]. The Summary Order states,

> On November 18, 2010, when Dervishi sought administrative review, the placement "actually functioning at the time" was the home program that that the school district had agreed to fund for the previous school year. The Board only agreed to fund T.D.'s home program on a temporary basis; but, because "the Board's obligation to fund stay-put placement is rooted in the statute, not contract," the parties' intent as to the duration of T.D.'s home program does not alter the Board's reimbursement obligation under the stay-put provision.

[Doc. #93 at 4-5]. On remand, the Appeals Court ordered this Court to "calculate the total value of the home program, as specified in the settlement agreement." [Doc. #93 at 5]. Accordingly, the Court finds defendant's argument unavailing.

---

#100 at 4; Doc. #103]. Accordingly, the period for reimbursement under the stay-put provision of the IDEA is November 18, 2010 through August 4, 2016.

Similarly, the Court declines to deny plaintiff reimbursement for time the Board contends is attributable to the parents' "obstructionist and dilatory actions." [Doc. #100 at 6-7]. As set forth by the Appeals Court, "[t]he stay-put provision of the IDEA provides that 'during the pendency of any proceedings conducted pursuant to this section...the child shall remain in [his] then-current educational placement.'" [Doc. #92 at 4 (quoting 20 U.S.C. §1415(j))]. The Appeals Court further directed that "[a] school district is responsible for funding educational placement during the pendency of a dispute under the IDEA regardless of whether the case is meritorious or whether the child would otherwise have a substantive right to that placement." Id. (citing Doe v. E. Lyme Bd. of Educ., 790 F.3d 440, 453 (2d Cir. 2015), cert. denied, 136 S. Ct. 2022, 195 L. Ed. 2d 218 (2016), reh'g denied, 136 S. Ct. 2546, 195 L. Ed. 2d 882 (2016)).

## FACTUAL FINDINGS

### A. Service Providers

As set forth above, the 2009 Settlement Agreement provided for limited home-based services because it anticipated that the Agreement would be effective only until an IEP for the 2010-2011 school year was developed. Plaintiff testified that in October 2010, prior to her filing for a due process hearing, T.D. was

receiving services from Carol Fiorile, Ph.D.; Lucinda Ribeiro; Marilena Baldino; and Communication Clinic of Connecticut, LLC.[4]

1. Home-Based Program as of November 18, 2010

Based on the evidence submitted at the hearing, the Court awards reimbursement in the amount of $30,222.50 for home-based services that were in place on November 18, 2010, when plaintiff requested a due process hearing challenging the 2010-2011 IEP, and subsequently rendered while the due process challenge was pending. Plaintiff met the burden of proof, set forth in the 2009 Settlement Agreement,[5] by presenting invoices for services and proof of payment for this amount. The invoices and proof of payment showed services provided to T.D. in November 2010 by Carol Fiorile, Ph.D., in the amount of $885; from November 18, 2010 through June 24, 2011 by Lucinda Ribeiro in the amount of $21,332,00; from November 23, 2010 through March 8, 2011 by the

[4]On October 27, 2010, prior to the request for a due process hearing, Dr. Holland emailed plaintiff stating, in part, that "without direction from an IEP meeting recommendation I am not empowered to support your request. Do not send your invoices to us." [Pl. Ex. 31; see also Tr. 3/29/17 at 570:18-19 (Dr. Holland testified, "[w]e did not pay any invoices once the settlement agreement ended."); H.O. Dec. at 18 ("Because the IEP offers an appropriate program in the [least restrictive environment], the Parents are not entitled to reimbursement for any other placement, including reimbursement for their home program and/or the McCarton School....")].

[5] The Board correctly asserts that under the 2009 Settlement Agreement, plaintiff has the burden of presenting "invoices and cancelled checks" to show that services, as defined under the Agreement, were rendered. [Doc #100 at 8].

Communication Clinic of Connecticut, LLC. in the amount of $1,554; and from November 18, 2010 through March 29, 2011 by Marilena Baldino in the amount of $6,451.50.

| **SUMMARY**<br>Service Providers as of November 18, 2010 | | |
|---|---|---|
| Carole Fiorile, Ph.D. | $ 885.00 | |
| Lucinda Ribeiro | $21,332.00 | |
| Communication Clinic of Connecticut, LLC | $ 1,554.00 | |
| Marilena Baldino | $ 6,451.50 | |
| **TOTAL** | | **$30,222.50** |

2. Service Providers Hired After November 18, 2010

Plaintiff also seeks reimbursement for therapy from Dr. Stephanie Bader and various YMCA programs in 2015 and 2016. She would be entitled to reimbursement for these services if they are substantially similar to the services being rendered at the time the due process challenge was filed, that is within the scope of the "home program that the [Board] had agreed to fund for the previous year." [Doc. #93 at 5].

a. Stephanie Bader, Ph.D., Westchester Institute Human Development-December 2015-March 2016

Defendant contends this was not a reimbursable service specified in the 2009 Settlement Agreement, so reimbursement should be denied. [Doc. #141 at 9; Tr. 3/29/17 at 437:14-17 (Dr. Holland testifying that at no point did the Board agree to pay for services related to family therapy)].

The Court agrees. Plaintiff testified that when T.D. turned 17 years old, she sought counseling to address his behavioral issues in a total of five sessions, from December 21, 2015 through March 7, 2016. [Pl. Ex. 1 at 12-20]. Plaintiff provided proof of payment for four sessions totaling $740. [Pl. Ex. 1 at 14, 16, 18, 20]. Mrs. Dervishi testified that she participated in the counseling sessions with her son. Plaintiff has not demonstrated that this type of expense was paid by the Board during the 2009-2010 school year and this service is not included in the services listed at paragraph 3 in the 2009 Settlement Agreement. See Tr. 3/16/17 at 96:20-22, 98:16-22; Tr. 3/22/17 at 252:15-18, 253:24-254:4. Dr. Bader testified that she provided family therapy[6] to Mrs. Dervishi and T.D., which

[6] Dr. Bader explained that

> sometimes terminology is a little bit confusing, but the family therapy billing code is typically the billing code that I use working with the clients that I work with, given that they're usually lower functioning and usually the families have to be involved. The difference of the billings between family therapy and psychotherapy is honestly whether or not the parent or family is actually in the session room, and whether or not we're talking about skills that the family can work with, too.

Tr. 3/22/17 at 254:13-24. She continued, "[s]o was it ABA services in terms of the – home-based programming and teaching academic skills in a certain strategic manner? No, but was it kind of the broader sense of applied behavior analysis in how we affect change and how we can address behavior? Yes." Id. at 256:9-14.

consisted of offering Mrs. Dervishi skills to manage T.D.'s behavioral issues, coaching/teaching compliance with taking directions, completing tasks and addressing difficulties with personal boundaries.[7] Tr. 3/22/17 at 244:21-245:3, 246:6-17, 247:14-20, 250:24-252:11, 253:10-13.

Accordingly, the request for reimbursement of costs for services provided by Dr. Stephanie Bader at Westchester Institute for Human Development in 2015-2016 is DENIED.[8]

---

[7] On recross examination, defendant asked,

> Q. Dr. Bader, if I understand your testimony just then, you worked with T.D. and Mrs. Dervishi to provide family therapy. Right?
>
> A. Correct.
>
> Q. And you worked with coaching Mrs. Dervishi on how to provide direction to T.D. is that right?
>
> A. Correct.
>
> Q. And if I heard you correctly, you were training her as a parent on how to deal with a child with a disability, a special education student, for example. Is that correct?
>
> A. Correct.
>
> Q. You weren't training her as a therapist in any way?
>
> A. No.

Tr. 3/22/17 at 259:22-260:12; see also id. at 257:11-258:1.

[8] The Court has considered whether Dr. Bader's services might be reimbursable under the rubric, "autism consulting services." However, based on the record at the hearing, the kind of

b. YMCA Fall 2015-July 2016

Defendant contends this is not a reimbursable service set forth in the 2009 Settlement Agreement and reimbursement should be denied. [Doc. #141 at 10; Tr. 3/29/17 at 438:4-10 (Dr. Holland testifying that at no point did the Board agree to pay for services at the YMCA)].

The Court agrees. Plaintiff testified that the Board did not pay for this expense during the 2009-2010 school year and this service is not included in the listed services at paragraph 3 in the 2009 Settlement Agreement. See Tr. 3/16/17 at 54:16-22, 64:21-25, 94:11-15. Plaintiff offered no evidence that services from the YMCA were paid for by Stamford at any time and no explanation of how they came within the scope of the program described in the Settlement Agreement. Accordingly, the request for reimbursement of costs and the provision of transportation associated with the YMCA programs in 2015-2016 is DENIED.

B. Transportation

Plaintiff seeks reimbursement of transportation expenses at the applicable IRS standard business mileage rate from July 3,

---

coaching therapy Dr. Bader described was different from the evaluative and oversight services provided by Dr. Fiorile, for example. Designing an educational program for T.D. and reporting on his progress, as witnesses testified Dr. Fiorile did, seems quite distinct from the family therapy Dr. Bader undertook.

2010 through December 31, 2016, in the amount of $10,419.[9] [Pl. Ex. 2]. To the extent that Mrs. Dervishi seeks reimbursement for her time to transport T.D. to services, the request is denied. [Doc. #142 at 2 (seeking compensation "for the value of my time in performing the transportation function under pendency."); Tr. 3/16/17 at 105:5-108:23 (seeking compensation for time transporting and staying at appointments with providers); Tr. 3/16/17 at 113:12-24 (plaintiff conceding that the 2009 Settlement Agreement does not provide for compensation for her time transporting T.D. to services); see A.S. v. Harrison Township Bd. of Educ., Civil No. 14-147 (NLH/KMW), 2016 WL 1717578, at *5 (D.N.J. Apr. 29, 2016) (declining to award minimum wage for time spent transporting child to school); Ruby v. Jefferson Cty. Bd. of Educ., 122 F. Supp. 3d 1288, 1308 (N.D. Ala. 2015) ("[Plaintiff] is entitled to costs, not wages. The court concludes that Defendant did not deny Plaintiff a FAPE by offering her only the costs associated with transporting L.L. to and from [school], and not the costs that Defendant would have

---

[9] Plaintiff seeks reimbursement at the IRS standard business mileage rate, as specified in the Settlement Agreement. [Pl. Ex. 2 at 2]. See A.S. v. Harrison Township Bd. of Educ., 2016 WL 1717578, at *6 ("calculat[ing] IDEA mileage reimbursement using the IRS standard business mileage rate at the time the mileage expenses were incurred.")(citing cases). The business mileage rate in: 2010 was 50 cents per mile; 2011 was 51 cents per mile; 2012 was 55.5 cents per mile; 2013 was 56.5 cents per mile; 2014 was 56 cents per mile; 2015 was 57.5 cents per mile; and 2016 was 54 cents per mile. See https://www.irs.gov/uac/newsroom

had to pay an employee in her stead.”). Plaintiff is entitled to reimbursement for the actual costs of transportation at the IRS standard business mileage rate.

a. Communication Clinic of Connecticut, LLC

Plaintiff seeks reimbursement for transportation to the Communication Clinic of Connecticut, LLC from November 23, 2010 through March 8, 2011. [Pl. Ex. Pl. Ex. 1 at 50-59]. Roundtrip mileage from T.D.’s home to Communication Clinic of Connecticut, LLC is 36.9 miles.[10] [Pl. Ex. 2 at 6-7]. Plaintiff transported T.D. to Communication Clinic of Connecticut six (6) times in 2010 or 221.4 miles and four (4) times in 2011 or 147.6 miles. [Pl. Ex. 1 at 50-59]. The Court awards reimbursement for 2010 in the amount of $110 [221.4 miles at 50 cents/mile] and for 2011 in the amount of $75.27 [147.6 miles at 51 cents/mile] totaling $185.27.

b. Fairfield Rehabilitation Associates, Inc.

Plaintiff seeks reimbursement for transportation to Fairfield Rehabilitation Associates from March 25, 2011 through December 16, 2013. [Pl. Ex. 2 at 10-64]. Roundtrip mileage from

[10] Communication Clinic of Connecticut, LLC is located at 137 Ethan Allen Highway, Ridgefield, CT. Plaintiff submitted a mileage claim of 18.3 and 18.6, as measured by Google Maps, from T.D.’s residence to Communication Clinic of Connecticut, LLC., or 36.9 miles round trip. [Pl. Ex. 2 at 6-7].

T.D.'s home to Fairfield Rehabilitation Associates is 39.8 miles.[11] [Pl. Ex. 2 at 8-9; Pl. Ex. 39]. Plaintiff transported T.D. to Fairfield Rehabilitation Associates forty-seven (47) times in 2011 [Pl. Ex. 2 at 10-18]; one hundred, forty-two (142) times in 2012 [Pl. Ex. 2 18-47]; and one hundred and eight (108) times in 2013. [Pl. Ex. 2 47-64]. The Court awards reimbursement for 2011 in the amount of $954 [1,870.6 miles at 51 cents/mile]; for 2012 in the amount of $3,136.63 [5,651 miles at 55.5 cents/mile]; and for 2013 in the amount of $2,428.59 [4,298.4 miles at 56.5 cents/mile] totaling $6,519.22.

c. Greenwich Education and Prep., LLC

Plaintiff seeks reimbursement for transportation to services provided at Greenwich Education and Prep., LLC, (also referred to as the Pinnacle School), for twenty (20) days from April 3, 2013 through May 8, 2013.[12] [Pl. Ex. 21 at 1-3; Pl. Ex.

---

[11] Fairfield Rehabilitation Associates, Inc. is located at 1931 Black Rock Turnpike, Fairfield, CT. Plaintiff submitted a mileage claim of 19.8 and 20 miles, as measured by Google Maps, from T.D.'s residence to Fairfield Rehabilitation Associates, Inc., or 39.8 miles round trip. [Pl. Ex. 39 at 1].

[12] Plaintiff attended Greenwich Education and Prep., LLC for twenty (20) days on April 3, 8, 9, 10, 11, 15, 16, 17, 18, 22, 23, 24, 25, 29, 30 and May 1, 2, 6, 7, and 8, 2013. [Pl. Ex. 40 at 4]. Plaintiff also testified that she withdrew T.D. from the program on May 8, 2013. [Tr. 3/16/17 at 165:12, 171:2; Tr. 3/22/17 at 277:7-10, 351:7-8, 366:4-5]. There is also an email dated Tuesday, May 14, 2013, from Alisa Dror of Greenwich Education and Prep., LLC, stating that she received an email from Mrs. Dervishi withdrawing T.D. from the school. [Pl. Ex.

40 at 4]. Roundtrip mileage from T.D.'s home to Greenwich Education and Prep., LLC is 7.6 miles.[13] [Pl. Ex. 2 at 8-9; Ex. 40 at 3]. Plaintiff transported T.D. to Greenwich Education and Prep., LLC for services twenty (20) times in 2013 or 152 miles. [Pl. Ex. 21 at 1-3; Pl. Ex. 40 at 4]. The Court awards reimbursement in the amount of $85.88 [152 miles at 56.5 cents/mile].

| **SUMMARY Transportation Reimbursement** | | |
|---|---|---|
| Communication Clinic of Connecticut, LLC | $ 185.27 | |
| Fairfield Rehabilitation Associates, Inc. | $ 6,519.22 | |
| Greenwich Education and Prep, LLC | $ 85.88 | |
| **TOTAL** | | **$ 6,790.37** |

45, 47]. On rebuttal, plaintiff asserted that T.D. attended this program through May 14, 2013. Compare Pl. Ex. 40 at 4 with Doc. #132 at ¶62. Greenwich Education and Prep., LLC services were paid for by the City of Stamford. [Pl. Ex. 21 at 4-6]. Dr. Holland testified that T.D. attended the program through June 20, 2013. Tr. 3/29/17 at 434:15; Def. Ex. 521.

[13] Greenwich Education and Prep., LLC, also referred to as Pinnacle School, is located at 44 Commerce Road, Stamford, CT. Plaintiff submitted a mileage claim of 3.8, as measured by Google Maps, from T.D.'s residence to Greenwich Education and Prep., LLC, or 7.6 miles round trip. [Pl. Ex. 40 at 3].

C. Mrs. Shkelqesa Dervishi

Plaintiff seeks an award of $435,350 for the home-based program she says she provided to T.D. from November 18, 2010 through August 4, 2016. [Pl. Ex. 4, 4A (seeking payment for 7,026 hours at $50-$70 per hour from 2010 through September 2016)]. She contends that she was subsequently forced to discontinue the professional services that were in place at the time she requested due process and provide home-based programming because the Board refused to reimburse her for professional services and she was financially unable to continue to pay the providers.[14]

The Board argues that the 2009 Settlement Agreement only contemplated reimbursement "in the amount of $2,500 per week for the cost of speech, occupational therapy [] ABA services and autism consulting services" that were provided. [Def. Ex. 500 ¶3 (emphasis added)]. Defendant contends that the "home based program" for services was defined in the 2009 Settlement Agreement and it makes no mention of services provided by T.D.'s mother. [Doc. #141 at 11 (citing Tr. 3/16/17 at 111:20-24) ("In fact, the plaintiff conceded that the settlement agreement

[14] Dr. Fiorile did not provide services after November 2010. [Pl. Ex. 1 at 3-6]. Ms. Fera of Communication Clinic of Connecticut, LLC. did not provide services after March 8, 2011. [Pl. Ex. 1 at 59]. Ms. Baldino's last service date was March 29, 2011. [Pl. Ex. 1 at 69]. The last date of service for Ms. Ribeiro is June 24, 2011. [Pl. Ex. 1 at 49].

contains no provision that the Board would pay for her time for providing services to the Student.”); (citing Tr. 3/29/17 at 439 (Dr. Holland testifying, “we will not reimburse unless ordered by the Court for services provided by a parent.”)].

The Court finds that Mrs. Dervishi is not entitled to payment for providing her own services to T.D.

1. Qualified Personnel

It is undisputed that Mrs. Dervishi is not “qualified” to provide services as defined by the IDEA and its regulations.[15]

[15] The IDEA defines “qualified personnel” as
(i) special educators;
(ii) speech-language pathologists and audiologists;
(iii) occupational therapists;
(iv) physical therapists;
(v) psychologists;
(vi) social workers;
(vii) nurses;
(viii) registered dietitians;
(ix) family therapists;
(x) vision specialists, including ophthalmologists and optometrists;
(xi) orientation and mobility specialists; and
(xii) pediatricians and other physicians
20 U.S.C. §1432(4)(F); see 20 U.S.C. §1401(26)(A) (“The term “related services” means transportation, and such developmental, corrective, and other supportive services (including speech-language pathology and audiology services, interpreting services, psychological services, physical and occupational therapy, recreation, including therapeutic recreation, social work services, school nurse services designed to enable a child with a disability to receive a free appropriate public education as described in the individualized education program of the child, counseling services, including rehabilitation counseling, orientation and mobility services, and medical services, except that such medical services shall be for diagnostic and evaluation purposes only) as may be required to assist a child with a disability to benefit from special education, and

She does not hold a degree in education or special education and she is not licensed or certified as a Board Certified Behavior Analyst ("BCBA"), or in the provision of Applied Behavior Analysis ("ABA") services.[16] [Tr. 3/22/17 at 313:13-14 (testifying "I know I'm not, you know, licensed as an ABA therapist[.]"), 334:5-15 (testifying she visited websites, stayed in touch with former service providers, sought assistance from her sister who "had been a special ed teacher in my country working with special needs...."); 334:5-15 (testifying she also visited other school programs), 371:11-374:6 (discussing credentials); see 34 C.F.R. §303.31 ("Qualified personnel means personnel who have met State approved or recognized certification, licensing, registration, or other comparable requirements that apply to the areas in which the individuals are conducting evaluations or assessments or providing early intervention services."); see Conn. Gen. Stat. §10-76ii (as of June 15, 2012, the State requires certification to provide ABA services to special education children)]. Mrs. Dervishi contends that the Board was "aware of [her] qualification [that she]

---

includes the early identification and assessment of disabling conditions in children.").

[16] Plaintiff submitted a letter dated April 12, 2017, from The Autism Treatment Center of America, confirming that Mrs. Dervishi attended a thirty-five hour training course, "The Son-Rises Program Start-Up," during the week of September 19 through 24, 2004. [Doc. #132, Ex. 53].

received through the high qualified experts and therapist [she] had home for years as from Dr. Fiori[le]...and Lucy Rib[i]ero....” [Doc. #132 ¶68].

However, Dr. Fiorile did not testify at the hearing and Ms. Ribeiro testified that she did not formally oversee and/or monitor the provision of ABA services by plaintiff after Dr. Fiorile stopped working with T.D. in June 2011. [Tr. 3/22/17 at 187:6-10, 195:9-18 (Ribeiro testifying that the BCBA [Board Certified Behavior Analyst], Dr. Fiorile, provided T.D.’s progress reports to the District); 210:7-16 (Ribeiro testifying that T.D’s home-based program was created by Dr. Fiorile); 213:10-19 (Ribeiro testifying that she graphed T.D.’s ABA progress data and during 2010-2011, she “did not know if there was any reporting to the district” because Dr. Fiorile wrote the progress reports); 220:4-10 (Ribeiro testifying that the ABA program was prepared by Dr. Fiorile); 221:11 (Ribeiro testifying that during 2010-11 she worked without supervision); 225:2-16 (Ribeiro testifying that she did not graph T.D.’s ABA programming after June 2011), 239:4-24 (Ribeiro testifying she would not be comfortable with Mrs. Dervishi providing ABA services without supervision)].

Ms. Ribeiro testified that Dr. Fiorile, who is a BCBA, developed the home-based program for T.D. which included programming and supervision through November 2010. See Tr.

3/22/17 at 377:2-3. Thereafter, Ms. Ribeiro and Mrs. Dervishi provided home-based services without any oversight or supervision of the programming. Dr. Fiorile's last invoice is dated November 2010 and Ms. Ribeiro's last invoice is dated June 24, 2011. [Pl. Ex. 1 at 3-6; 21-49].

Ms. Ribeiro provided no further services, programming, support or supervision after June 2011.[17] [Tr. 3/22/17 at 222:21-25, 223:5-8, 224:8-225:1]. Mrs. Dervishi has not shown that T.D. received any oversight from a BCBA or ABA therapist or other education professional after June 2011.[18] See Tr. 3/22/17 at

[17] Plaintiff also asserted that she was "supervised and got feedback" from Dr. Bader. However, Mrs. Dervishi and T.D. met with Dr. Bader on only five occasions in the context of family therapy to address her son's behavioral problems. [Tr. 3/16/17 at 10:11-15, 48:20-21, 48:25-49:1; Pl. Ex. 1 at 12-13, 15, 17, 19]. Dr. Bader's testimony does not support plaintiff's contention that the home-based services she provided to her son were supervised by the doctor. Tr. 3/22/17 at 257:11-258:1 (Dr. Bader testifying, "I would say I had trained you to be a mother of a child with special needs. I mean, children with special needs require parents to take on a little bit of a different role in terms of using every opportunity as a learning opportunity. So I didn't specifically train you to be, like, a therapist to be able to do, like, home-based [therapy] services. But I worked with you so that you could work with your son to build up his skills."), 260:10-12 ("You weren't training her as a therapist in any way? No.").

Similarly, plaintiff provided no evidence that after November 2010 Dr. Fiorile provided consulting services, developed ABA programming, certified that T.D. mastered ABA programs, or communicated with the Board. [Tr. 3/16/17 at 24:19-25:2; 35:8-12].

[18] In contrast, in Bucks County Dept. of Mental Health/Mental Retardation v. Commonwealth of Pa., 379 F.3d 61, 63 (3d Cir. 2004), the mother seeking reimbursement was trained by a Lovaas-

335:8-12 (plaintiff testified that "in order to develop an ABA program we need a BCBA to be a member of the PPT. We need an ABA to be a member of the PPT, or a social work [who] can read a psychologist evaluation at a PPT.").

It is also undisputed that Dr. Fiorile, Lucinda Ribeiro, Communication Clinic of Connecticut, LLC, and Marilena Baldino are "qualified providers" under 20 U.S.C. §1432(4)(F); 34 C.F.R. §303.31. Here, the Board offered T.D. a FAPE for the 2010-2011 school year. When plaintiff challenged the 2010-2011 IEP, the pendency services in place were being obtained from these

trained therapist to provide in-home therapy to her child. Since the therapist was not available to provide as many hours with the child as needed, she trained the mother in the methodology to provide additional hours per week. Evidence of the mother's training included testimony from the Early Intervention Coordinator at Bucks County, specific examples of training exercises the mother executed with her child, and affidavits from therapists confirming that the mother was acting as a Lovaas therapist, not as a mother, when working with the child. Id. Importantly, the Lovaas-trained therapist continued to work with the child during the entire period of reimbursement and provided oversight. See Id. at n.3. The holding in Bucks County is narrow. The Third Circuit Court of Appeals held "that under the particular circumstances of this case, where a trained service provider is not available and the parent stepped in to learn and perform the duties of a trained service provider, reimbursing the parent for her time spent in providing therapy is 'appropriate' relief." Id. at 63.

It is further noted that Bucks County also argued that the Lovaas therapist was not qualified to train the mother and the therapist did not develop a written curriculum to document the program or create daily logs or records to document the child's successes. The Court rejected this argument as a challenge to the appropriateness of the Lovaas training which had already been adjudicated by the lower court and Bucks County failed to appeal those findings. Id. at n.8.

qualified providers, not Mrs. Dervishi. Mrs. Dervishi, who is not a "qualified provider" under the IDEA, is not entitled to payment for services she substituted for those that had been offered by qualified providers under the Settlement Agreement.

Nor should the Board be required to pay costs incurred by the parents' decision to discontinue the qualified private services that were in place under the Settlement Agreement. Here, although the services covered by the settlement agreement were limited (because it was expected to be of short duration), the parents' decision to keep T.D. out of school while they sought due process expanded only the duration of the services, not their scope.

> [P]arents who unilaterally change their child's placement during the pendency of review proceedings, without the consent of state or local school officials, do so at their own financial risk. If the courts ultimately determine that the IEP proposed by the school officials was appropriate, the parents would be barred from obtaining reimbursement for any interim period in which their child's placement violated §1415[(j)].[19]

School Comm. of the Town of Burlington, Mass. v. Dept. of Educ., 471 U.S. 359, 373-74 (1985); see T.M. ex rel. A.M. v. Cornwall Cent. School Dist., 752 F.3d 145, 172 (2d Cir. 2014)(finding

[19] Section 1415(j) states that "during the pendency of any proceedings conducted pursuant to this section, unless the State or local educational agency and the parents otherwise agree, the child shall remain in the then-current educational placement of the child . . . ." 20 U.S.C. §1415(j).

that the School District satisfied its duties under 20 U.S.C. §1415(j) by reimbursing the "parents for the amount they spent on [the child's] pendency services in the 2010-2011 year, and by offering to provide the required pendency services directly from that point onwards. When T.M.'s parents rejected Cornwall's offer to provide pendency services directly for the 2011-12 year, they took responsibility for the cost of obtaining those services from private providers.").

The record shows that none of the professionals who evaluated T.D. recommended a home-based program provided by his parents. [Pl. Ex. 56 (2012 language and speech evaluation by Josephine K. Chen, M.S., CCC, recommending "intensive clinical intervention" in an educational setting.); Pl. Ex. 32 (August 2013 psychoeducational evaluation by Dr. Erik Mayville recommending a full-day, 12-month ABA-based educational program, including a residential program if acceptable to the family. "A BCBA should ensure that the program is supported at all times by technical expertise in ABA.")].

Although plaintiff contends that "[t]he family provided the same program and services to T.D. till the pendency was over," the record shows that qualified services with Dr. Fiorile, Lucinda Ribeiro, Communication Clinic of Connecticut, LLC and Marilena Baldino, were discontinued in 2011 and no qualified education specialist was supervising T.D.'s program thereafter.

[Doc. #132 ¶8]. The Court cannot find that Mrs. Dervishi provided the "same program and services" as the professionals did during the pendency stay-put. Plaintiff's equivalency argument is not supported by the record.

Plaintiff's reliance on Bucks County Dept. of Mental Health/Mental Retardation v. Commonwealth of Pa. in support of her claim for reimbursement is distinguishable on its facts.[20] 379 F.3d 61 (3d. Cir. 2004). In Bucks County, the school district refused to provide Lovaas, an ABA therapy, to the child in question. The parents of the student paid to provide Lovass therapy. Id. at 63. Because the Lovaas-trained therapist was not able to spend as many hours with the child as needed, and because the parent was unable to find another person trained in the Lovaas method, the parent was trained in the method and coached by the therapist to provide additional therapeutic hours. Id. The Commonwealth Court of Pennsylvania determined that the individualized family service plan ("IFSP") was not appropriate and it also determined that the private training was

[20] Plaintiff provided additional cases for the Court's consideration on March 15, 2017. Student X v. New York City Dept. of Educ., No. 07-CV-2316 (NGG)(RER), 2008 WL 4890440 (E.D.N.Y. Oct. 30, 2008); Hurry v. Jones, 734 F.2d 879 (1st Cir. 1984); M.R. v. Ridley School District, 744 F.3d 112 (3d Cir. 2014); R.E. v. New York City Dept. of Educ., 694 F.3d 167 (2d Cir. 2012); Frank G. v. Board of Educ. of Hyde Park, 459 F.3d 356 (2d Cir. 2006); Board of Educ. of the Pawling Central School Dist. v. Schutz, 290 F.3d 476 (2d Cir. 2002).

appropriate. Id. at 67. Bucks County did not appeal the decision. Id. A hearing officer awarded the parents both their out-of-pocket expenses and money for their time and effort. Id. at 64-65.

The Third Circuit affirmed the hearing officer's award, noting that, "[r]eimbursing parents for the time and services necessary for their child when there has been an IDEA violation, is not unheard of." Id. at 69 (emphasis added). In approving reimbursement to the parent, the Court found that there was "ample evidence in the record to support the conclusion that [the mother] stepped into the shoes of a therapist" and the Hearing Officer found that the mother was a "trial training provider." Id. at 73 and 63 (finding that the therapist trained and coached the mother in one-on-one workshops; the mother read and learned discrete training teaching guidelines and books on the Lovaas methodology; the "Early Intervention Coordinator at Bucks County testified at the due process hearing that, in her opinion, [the mother] was qualified to train [the child]"; the mother testified to specific examples of training exercises she executed when training her child; and the child's "therapists provided affidavits confirming that [the mother] was acting as a Lovaas therapist, not as a mother, when she was working with [her child]."). As such, the Court "was required to defer to this finding unless it could point to contrary nontestimonial

extrinsic evidence." Id. at 73. The Appeals Court found there was no "contrary nontestimonial extrinsic evidence in the record" to "compel a different finding." Id.

Importantly, the IDEA's "'stay-put rule,'

> serves "in essence, as an automatic preliminary injunction," Drinker [by Drinker v. Colonial School Dist., 78 F.3d [859,] 864 [(3d Cir. 1996)], reflecting Congress's conclusion that a child with a disability is best served by maintaining her educational status quo until the disagreement over her IEP is resolved, Pardini v. Allegheny Interm. Unit, 420 F.3d 181, 190 (3d Cir. 2005); Drinker, 78 F.3d at 864. "'Once a court ascertains the student's current educational placement, the movants are entitled to an order [maintaining that placement] without satisfaction of the usual prerequisites to injunctive relief.' " Drinker, 78 F.3d at 864 (quoting Woods v. N.J. Dep't of Educ., No. 93-5123, 20 Indiv. Disabilities Educ. L. Rep. (LRP Publications) 439, 440 (3d Cir. Sept. 17, 1993)); see also Pardini, 420 F.3d at 188 ("Congress has already balanced the competing harms as well as the competing equities"); Zvi D. v. Ambach, 694 F.2d 904, 906 (2d Cir. 1982) ("The statute substitutes an absolute rule in favor of the status quo for the court's discretionary consideration of the factors ....").

M.R. v. Ridley Sch. Dist., 744 F.3d 112, 118 (3d Cir. 2014). Here, the Court of Appeals found that T.D.'s "then-current educational placement" when Dervishi sought a due process hearing was the home-based service program in place under the 2009 Settlement Agreement.

In Bucks County, the "reimbursement" remedy was based upon the determination that the individualized family service plan ("IFSP") was "not 'appropriate' because [the child] was not

making meaningful progress toward her IFSP goals" and that the parent's private Lovass therapy was appropriate. Id. 379 F.3d at 67; see also, School Comm. of the Town of Burlington, Mass. v. Dept. of Educ. of Mass., 471 U.S. 359, 370 (1985)(holding that reimbursing parents for expenses incurred from placing their child in private school is "appropriate" relief when a court has found that the public school placement was inappropriate and that the parents' private placement was appropriate). Notably in each of the cases cited by the Court in Bucks County in support of reimbursement to parents for time and services, there was a finding of an IDEA violation. 379 F.3d at 69 (citing Hurry v. Jones, 734 F.2d 879 (1984)[21]; Straube v. Florida Union Free Sch. Dist., 801 F. Supp. 1164, 1182 (S.D.N.Y. 1992)("The value of contributed parental services may be considered as damages only when those efforts were made in providing services to which the child was entitled as a matter of law.")).

---

[21] C.f. A.S. v. Harrison Twp. Bd. of Educ., No. 14-147 (NLH/KMW), 2016 WL 1717578, at *5 (D.N.J. Apr. 29, 2016), reconsideration denied, No. 14-147 (NLH/KMW), 2016 WL 4414781 (D.N.J. Aug. 18, 2016)(In distinguishing Hurry, 734 F.2d at 881, the Court in A.S. noted that "due to the child's disability and weight, the school bus was unable to transport the student. The issue the court considered was whether the parents were entitled to reimbursement for transportation where the student's disability required a special type of transportation to school." (emphasis added).

This case is vastly different. Here, the Appeals Court determined that the Board provided a FAPE for the 2010-2011 school year and declined to "consider whether the parents' alternate placements were appropriate." [Doc. #93 at 4]. Further, the Appeals Court held there was "no basis in the record to conclude the Board breached the 2009 settlement agreement." [Doc. #93 at 5]. Because the Court of Appeals found no IDEA violation or breach of the 2009 Settlement Agreement, there are no grounds for this Court to fashion additional relief here. See Burlington, 471 U.S. at 370-71 ("Reimbursement merely requires the Town to belatedly pay expenses that it should have paid all along and would have borne in the first instance had it developed a proper IEP."); Ruby v. Jefferson Cty. Bd. of Educ., 122 F. Supp. 3d 1288, 1309 (N.D. Ala. 2015) ("Plaintiff is entitled to costs, not wages. The court concludes that Defendant did not deny Plaintiff a FAPE by offering her only the costs associated with transporting L.L. to and from [school], and not the cost that Defendant would have had to pay an employee in her stead.").

During the pendency of this case, both before the Hearing Officer and District Court, no decision or ruling contradicted the defendant's position that the Board had no obligation to pay pendency services because plaintiff violated the explicit terms of the Settlement Agreement which "expressly conditioned [the

parents right to reimbursement] upon...the Student's continued attendance at the program selected by the Independent Consultants during the applicable portion of the 2009-10 school year." Id. This did not relieve the Board of the obligation to pay. The Court of Appeals held that "the parties' intent as to the duration of T.D.'s home program [did] not alter the Board's reimbursement obligation under the stay-put provision." [Doc. #93 at 4-5]. As set forth later in this opinion, equitable relief in the form of compensatory education may be available to remedy the Board's failure to provide pendency services during the stay-put. But the hearing record is devoid of evidence that plaintiff sought either reimbursement for expenses during the stay-put period or a court order requiring the Board to provide services.

Moreover, although the "Board's obligation to fund stay-put placement is rooted in statute, not contract," the Court is tasked with calculating the "total value of the home program, as specified in the [2009] settlement agreement" for the period of November 18, 2010 through August 4, 2016. [Doc. #93 at 4-5 (emphasis added)]. The 2009 Settlement Agreement specified limited services then being delivered by qualified providers. Nor is the Court persuaded by plaintiff's argument that she was forced to provide home-based services for her son because she

was unable to pay qualified providers.[22] [Tr. 3/29/17 at 608:15-17]. Plaintiff failed to demonstrate that she sought

[22] At several points during the pendency of plaintiff's appeal of the 2010-2011 IEP, the Board resumed discussions with plaintiff and/or her attorney to find an appropriate educational placement for T.D. See Pl. Ex. 42 (February 19, 2013 letter from plaintiff's attorney to Dr. Holland); Pl. Ex. 35 (emails dating from November 14, 2014 through December 18, 2015, from Janice Dixon, M.S.W., DDS Case Manager at the Department of Developmental Services to Mrs. Dervishi and Dr. Holland among others]. Dr. Holland also testified that at times during the pendency of this appeal, the Board's staff was not allowed access to evaluate T.D. [Tr. 3/29/17 at 558:25-559:2].

On or about April 3, 2013, T.D. was placed at the Pinnacle School for speech and ABA services. [Pl. Ex. 21; Tr. 3/29/17 at 429:10-12]. Dr. Holland testified,

> The parents may disagree with what I'm about to say, but I was concerned that this young man was not receiving services. I was concerned that he was not in the program. And I led the district to continue to look for other programs that the parents might accept. Pinnacle, being a program within the boundaries of Greenwich gave us an opportunity to provide services while we continued to look for services. And so we supported [it] financially.

[Tr. 3/29/17 428:20-429:4]. Dr. Holland denied that the placement was made unilaterally. He testified that "[i]n fact, it is in response to [plaintiff's] attorney's request to provide services at the Greenwich Ed[.] Group, which is Pinnacle while placement at CCD is – while we are awaiting that." [Tr. 3/29/17 512:19-25]. Mrs. Dervishi testified that she never agreed to the program offered by the Board at the Pinnacle School and she never signed the agreement to change T.D.'s IEP without convening a PPT meeting. [Tr. 3/29/17 at 510:4-11, 599:8-13; Def. Ex. 503]. In an email to Mrs. Dervishi dated April 13, 2013, Dr. Holland stated,

> You indicated that we have not had an [IEP] meeting. I had at your former attorney's request to arrange service at Greenwich education group while we await your son's [Connecticut Center for Child Development

reimbursement from the Board during the stay-put period after November 18, 2010, by providing the Board with invoices and proof of payment.[23] [Tr. 3/22/17 at 284:17-285:14; Tr. 3/29/17 at 440:13-441:2]. Nor has she made any showing that qualified

> ("CCCD")] placement. You did not sign[] an agreement that we sent your former attorney and you now are no longer represented by him. I ask you now a yes or no question. Do you want me to cancel the contract with Greenwich Ed. group, as you did not give your written approval?

[Pl. Ex. 44; Tr. 3/29/17 at 533:20-534:1]. Although the parties dispute the precise date Mrs. Dervishi withdrew T.D. from the Pinnacle School, it was sometime in May/June 2013. [Pl. Ex. 21, 40 at 3-4, 45, 46, 47; Tr. 3/16/17 at 165:12; 171:2; Tr. 3/22/17 at 277:7-10; Tr. 3/29/17 at 525:3-8; 541:1-2].

[23] Under the 2009 Settlement Agreement, the obligation to reimburse is triggered when plaintiff produced "documentation of payments (invoices and cancelled checks(s))" for related services provided to T.D. [Def. Ex. 500 ¶3]. Dr. Holland, however, testified that even if the Board were presented with the proper documentation during the stay-put the Board would not "reimburse unless ordered by the Court for services provided by a parent." [Tr. 3/29/17 at 439:8-9; see Pl. Ex. 31 (On October 27, 2010, prior to the request for due process, Dr. Holland emailed plaintiff stating, in part, that "without direction from an IEP meeting recommendation I am not empowered to support your request. Do not send your invoices to us."); Tr. 3/29/17 at 570:18-19 (Dr. Holland testified "[w]e did not pay any invoices once the settlement agreement ended."); id. at 573:3-5 (Dr. Holland was asked, "Did you provide services from 2011?" He responded, "If it was after the settlement agreement, no."); id. at 605:2-6 (Dr. Holland testifying that he did not know if he was ever rejected invoices after due process was filed "but I will go on record that if I had invoices submitted to me after the date of the settlement agreement, yes, I would have returned them."); id. at 612:16-23 (When asked why the Board did not pay Mrs. Dervishi for her work with T.D. Dr. Holland responded, "First, you're not a certified service provider. Second, I don't recall receiving any bill from you requesting us to pay you for your service.")].

providers were unavailable, as in Bucks County. Plaintiff has not offered any legal authority that would require a Board to pay a parent for educating her child at home when professional services were available in the community from qualified providers and a FAPE was offered by the Board.

Nor is this case similar to the situation in Doe v. E. Lyme Bd. of Educ., 790 F.3d 440, 456 (2d Cir. 2015). In Doe, it was "undisputed that the Board refused to pay for the services described in that IEP during the pendency of administrative and judicial proceedings" and that the "Board thus violated the stay-put provision." Id. at 453. This Court cannot find that Mrs. Dervishi's decision to discontinue the services being provided by Dr. Fiorile, Lucinda Ribeiro, Marilena Baldino and Felicia Fera at the Communication Clinic of Connecticut, LLC, to provide home-based services to T.D. was appropriate or compensable.

In Board of Educ. of the Pawling Cent. Sch. Dist. v. Schutz, 290 F.3d 476, 484 (2d Cir. 2002), a case relied on by plaintiff, the hearing officer awarded, and the State Review Officer affirmed, the payment of private school tuition during the stay-put pendency period. The Court found this "constituted a change in Kevin's current educational placement for purposes of the pendent placement provisions." Id. The Court added that the District's fear that it would have to reimburse the parents

perennially for their child's private education was misplaced. The Court stated that its conclusion did not mean that the District must fund the child's tuition for the remainder of his education, "but rather that, until a new placement is established by either an actual agreement between the parents and the District, or by an administrative decision upholding the District's proposed placement which the [parents] choose not to appeal, or by a court, the District remains financially responsible." Id.; see M.R. v. Ridley Sch. Dist., 744 F.3d at 119 ("[A]n administrative ruling validating the parents' decision to move their child from an IEP-specified public school to a private school will, in essence, make the child's enrollment at the private school her 'then-current educational placement' for purposes of the stay-put rule. Having been endorsed by the State, the move to private school is no longer the parents' unilateral action, and the child is entitled to 'stay-put' at the private school for the duration of the dispute resolution proceedings.")(citation omitted)). Here there has been no agreement between the parents and the Board, or an administrative or judicial ruling endorsing Mrs. Dervishi's provision of home-based services as a change to T.D.'s pendency placement.

Clearly an order to reimburse tuition for private school education is distinguishable from Mrs. Dervishi's reimbursement

claim. Because the Court of Appeals concluded that "the Board provided T.D. with a FAPE for the 2010-2011 school year," it declined "to consider whether the parents' alternative placements were appropriate."[24] [Doc. #93 at 2]. Based on this finding, this Court also declines to consider the same.

Accordingly, plaintiff's request for reimbursement for providing home-based services to T.D. is DENIED.

2. Compensatory Relief

Finally, plaintiff's request for "an award of compensatory relief" for "defendant's failure to abide by the automatic and unconditional pendency entitlement" for over six years is denied to the extent Mrs. Dervishi is seeking payment for home-based schooling that she provided to her son.[25] [Doc. #103 ¶4]. Plaintiff contends that because the Board failed to pay $2,500 per week for pendency services "from November 18, 2010 to August

---

[24] Both Judge Eginton and the Hearing Officer found the 2010-2011 IEP offered to T.D. was appropriate and did not violate the IDEA.

[25] Plaintiff argues

> Instead of taking responsib[ility] for stay-put services that denied for years that caused extremely serious damages to T.D., the district is questioning and refusing to reimburse or value my work based on the invoices I have presented. I'm asking the court to pay me for the time I spent as my son's therapist, not to pay me for the time I spent with my son as his mother.

[Doc. #132 ¶74].

4, 2016 (a total of 298 weeks)," this Court's discretionary reimbursement award may be up to $745,000 or $2,500 x 298 weeks. Id. ¶20. "The IDEA does not provide for compensatory money damages." Wenger v. Canastota Cent. Sch. Dist., 979 F. Supp. 147, 152 (N.D.N.Y. 1997), aff'd, 181 F.3d 84 (2d Cir. 1999), and aff'd, 208 F.3d 204 (2d Cir. 2000). "The purpose of the IDEA is to provide educational services, not compensation for personal injury, and a damages remedy—as contrasted with reimbursement of expenses—is fundamentally inconsistent with this goal." Polera v. Bd. of Educ. of Newburgh Enlarged City Sch. Dist., 288 F.3d 478, 486 (2d Cir. 2002).

> [T]he Supreme Court has emphasized that IDEA relief depends on equitable considerations. Accordingly, compensatory education is not a contractual remedy, but an equitable remedy, part of the court's resources in crafting appropriate relief. More specifically, as the Fourth Circuit has explained, [c]ompensatory education involves discretionary, prospective, injunctive relief crafted by a court to remedy what might be termed an educational deficit created by an educational agency's failure over a given period of time to provide a FAPE to a student.

Reid ex rel. Reid v. D.C., 401 F.3d 516, 523 (D.C. Cir. 2005) (internal citations and quotation marks omitted). Plaintiff's "hour-for-hour formula in effect treats compensatory education as a form of damages—a charge on school districts equal to expenditures they should have made previously." Id. This approach overlooks the Court's equity jurisdiction "to do equity and to mold each decree to the necessities of the particular

case. Flexibility rather than rigidity has distinguished it." Id. at 524 (quoting Hecht Co. v. Bowles, 321 U.S. 321, 329 (1944)).

Accordingly, to the extent plaintiff seeks an award of compensatory money damages, her claim is DENIED.

D. Prospective Compensatory Education

"There is, however, another remedy: compensatory education." Doe v. E. Lyme Bd. of Educ., 790 F.3d at 456. "Under the theory of "'compensatory education,' courts and hearing officers may award 'educational services...to be provided prospectively to compensate for a past deficient program.'" Reid ex rel. Reid, 401 F.3d at 522 (quoting G. ex rel. RG v. Fort Bragg Dependent Schs., 343 F.3d 295, 308 (4th Cir. 2003)); Somoza v New York City Dept. of Educ., 538 F3d 106, 109 n.2 (2d Cir. 2008) ("'Compensatory education' is prospective equitable relief, requiring a school district to fund education beyond the expiration of a child's eligibility as a remedy for any earlier deprivations in the child's education.") (citing Burr v. Sobol, 888 F.2d 258 (2d Cir. 1989)). "[W]hen an educational agency has violated the stay-put provision, compensatory education may-and generally should-be awarded to make up for any appreciable difference between the full value of stay-put services owed and the (reimbursable) services the parent actually obtained." Doe, 790 F.3d at 456-57.

The Court in Doe, recognized that if

> the parent cannot afford to finance any or all stay-put services, the Board would get to pay less than what it should have, or nothing-and, more important, less than what was needed for the child's benefit. Moreover, such an arrangement would make the stay-put obligation contingent on the means of a child's family-a legally irrelevant variable.

Id. at 456 (citing E.M. v. New York City Dep't of Educ., 758 F.3d 442, 452 (2d Cir. 2014) ("The IDEA promises a free appropriate education to disabled children without regard to their families' financial status."); Miener By & Through Miener v. State of Mo., 800 F.2d 749, 753 (8th Cir. 1986)("We are confident that Congress did not intend the child's entitlement to a free education to turn upon her parent's ability to 'front' its costs.")).

"Because the obligations imposed by the IDEA generally terminate when a child reaches the age of 21, compensatory education 'is unavailable to a claimant over the age of twenty-one in the absence of gross procedural violations.'" Doe, 740 F.3d at 456, n.15 (quoting Garro v. State of Conn., 23 F.3d 734, 737 (2d Cir. 1994); Mrs. C. v. Wheaton, 916 F.2d 69, 75 (2d Cir. 1990)); Wegner, 979 F. Supp. at 151 ("The Second Circuit... allows for compensatory education for a child over twenty-one years where there has been a gross violation of the IDEA.") (citation omitted).

> But even where gross violations occur, there is no obligation under the IDEA to provide a child with compensatory education equal to the length of time he or she was denied an appropriate education because compensatory education is not a contractual remedy, but an equitable remedy, part of the court's resources in crafting "appropriate relief."

Wegner, 979 F. Supp. at 151 (internal citation and quotation marks omitted). In Student X v. New York City Dept. of Educ., the Court found that "Defendant's violation of the statutory pendency provision was a gross violation." No. 07-CV-2316(NGG)(RER), 2008 WL 4890440, at *25 (E.D.N.Y. Oct. 30, 2008) (citing cases); see Burr by Burr v. Ambach, 863 F.2d 1071, 1075-76 (2d Cir. 1988) (finding a gross violation in the undue delay to hold a hearing and issue a hearing officer's decision resulting in a denial of "an appropriate education during pendency of the proceedings, the precise unfortunate result that the 'stay-put' provision was designed to prevent."); Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist., Westchester Cty. v. Rowley, 458 U.S. 176, 206-07 (1982)("[A] court's inquiry in suits brought under § 1415(e)(2) is twofold. First, has the State complied with the procedures set forth in the Act? And second, is the individualized educational program developed through the Act's procedures reasonably calculated to enable the child to receive educational benefits?").

It is important to note that this case differs from the compensatory education cases cited above. First, the 2009

Settlement Agreement did not purport to be a FAPE or an agreed-to IEP. Rather, the Agreement was a unilateral placement funded by the Board for a limited duration until the parties could agree to an IEP for the 2010-2011 school year. [Def. Ex. 500 ¶6 ("The Parties understand and acknowledge that the Board is making the payments described above solely as an accommodation to the Parents and in order to avoid the costs of protracted litigation.")]. The Hearing Officer found that "[b]ecause the [2010-2011] IEP offer[ed] an appropriate program in the LRE, the Parents were not entitled to reimbursement for any other placement, including reimbursement for their home program and/or the McCarton School...." [Doc. #81 at 60]. In August 2015, Judge Eginton found that the "Board's contractual duty to reimburse for home-based education ceased after the Parents rejected the independent consultants' 2010-2011 IEP which constituted the current placement for purposes of the stay-put provision. [Doc. #81 at 15]. In August 2016, the Appeals Court found that the Settlement Agreement did not alter the Board's obligation to fund T.D.'s educational placement during the pendency of the dispute and remanded the case to calculate reimbursement. [Doc. #93 at 4-5]. As stated, the Hearing Officer, District Court and Appeals Court <u>all</u> found that the Board offered T.D. a FAPE for the 2010-2011 school year. <u>See</u> Doc. #81, 93.

The evidence shows that T.D.'s parents did not seek reimbursement from the Board under the 2009 Settlement Agreement after due process was initiated on November 18, 2010. The Board would have been obligated to pay if the parents submitted the supporting documentation to process the reimbursement payments. Although the Board's witness candidly conceded that the Board would have declined to do so after the expiration of the Settlement Agreement, this would have provided plaintiff with an opportunity to petition the court for reimbursement.

In fashioning equitable relief, the Court must consider the parents' conduct in the context of the situation at the time they filed for due process. The Board had ceased payments under the Settlement Agreement prior to November 18, 2010, because the Dervishis had not complied with the Agreement. See Reid, 401 F.3d at 524 (internal citations and quotation marks omitted)("[C]ourts have recognized that in setting the award, equity may sometimes require consideration of the parties' conduct, such as when the school system reasonably requires some time to respond to a complex problem, or when parents' refusal to accept special education delays the child's receipt of appropriate services.").

Even if plaintiff could show a gross violation of the stay-put provision, a court can choose not to award compensatory education if there are no educational deficiencies to be made

up.[26] See Phillips v. Dist. of Columbia, 736 F. Supp. 2d 240, 247 (D.D.C. 2010) ("[I]t may be conceivable that no compensatory education is required for the [violation of a stay-put provision] either because it would not help or because [the student] has flourished in his current placement....") (citations and internal quotation marks omitted). Awarding compensatory education when there is no discernible lost progress and a student is on track academically is unnecessary because that would be akin to awarding damages which the IDEA does not allow. A.S. v. Harrison Twp. Ed. of Educ., Civil No. 14-147 (NLH/KMW), 2016 WL 1717578, at *4 (D.N.J. Apr. 29, 2016), reconsideration denied, No. 14-147 (NLH/KMW), 2016 WL 4414781 (D.N.J. Aug. 18, 2016) (finding that the student was "on the right educational path and did not require restoration."). "This means that the plaintiff has the burden of proposing a well-articulated [compensatory education] plan that reflects the student's current education abilities and needs and is supported by the record." Phillips, 736 F. Supp. 2d at 248 (citation and quotation marks omitted).

[26] Both the Hearing Officer and Judge Eginton found that "[t]he Board did not commit any procedural violations which resulted in a denial of FAPE during the 2010-11 school year." [Doc. #81 Ex. 1 at 19; Doc. #89 at 9 (ruling on summary judgment, Judge Eginton agreed with the Hearing Officer that "the Parents had been provided with a meaningful opportunity to participate in the development of the IEP.")].

To be fair, Mrs. Dervishi, pro se, has not requested compensatory education. Throughout these proceedings, Mrs. Dervishi has maintained that the home-based services that she solely provided after June 2011 were appropriate, that she followed the ABA programming and that T.D. met the set educational milestones and progressed. See Tr. 3/29/17 at 599:19-22 ("The services I provided were more, you know, T.D. can benefit and was making good progress at this time with the program I provided than you know, was offered for T.D."). This position was taken in her effort to receive reimbursement for the services she said she provided to her son, which she contended were as good as the services delivered by the private qualified providers. See Doc. #103 ¶13 ("The stipulation of settlement did not require us to conform to a particular program to recover the $2,500.00 in funding per week. So long as the pendency services fell under the enumerated categories, we could receive funding for $2,500.00 weekly."); ¶20 ("To the extent that Stamford failed to provide the $2,500 pendency benefit from November 18, 2010 to August 4, 2016 (A total of 298 weeks), this Court's pendency 'funding' discretion extends to $745,000, i.e. $2,500 x 298 weeks...we respectfully ask this Court to award the full amount of its pendency funding discretion or, in the alternative, such lesser amount as this Court believes is warranted under the circumstances."); ¶27 (The Board "fails to

take into account that it was left up to my husband and I, as T.D.'s parents, to determine the program mix for T.D., as long as it contained ABA, OT, ST or ABA consulting...The Stamford district left the programming up to us, and they were required to pay the $2,500 per week to fund these services."); ¶29 ("[T]he Second Circuit's remand order makes clear that we did not lose the right to ($2,500 per week) funding under pendency; an automatic and unconditional right." (emphasis in original)).

Plaintiff has not presented evidence or conceded that T.D. regressed during the pendency stay-put period of November 18, 2010 through August 4, 2016, even though, as Judge Eginton found in his summary judgment ruling, "[t]he evidence at the [due process] hearing indicated that the home-based education program has resulted in regression of T.D.'s skills and that his problematic behaviors had increased." [Doc. #89 at 11; see Doc. #81 at 11 (In May 2011, the Hearing Officer found that T.D. "continues to receive his education at his home program, which consists of one to one services in his bedroom. His lead home therapist [Ms. Ribeiro] testified that the Student is regressing in this program.")].

An August 1, 2013 Psychoeducational Evaluation from Dr. Erik A. Mayville states

> [T.D.] has been without the benefit of a formal, full-time educational program for several years. Through his overall level of intellectual functioning appears

> relatively unchanged, it is highly likely that he is not able to demonstrate the full range of academic, communication, and social interaction skills that he once did. Partial results of the Vineland-II may offer some support of skill loss in social coping skills, receptive communication, and personal daily living skills. It is expected that intensive, evidence-based instruction relevant to adolescents with ASDs will help [T.D.] recover previously learned skills and to learn new repertoires.

[Pl. Ex. 32 at 17; see also Pl. Ex. 42 at 2 (February 14, 2013 letter from Dr. Nancy O'Hara stating that T.D. "has had a significant increase in aggression, agitation and out-of-control behaviors" and recommending home bound tutoring with at least 20 hours of behavioral therapy weekly)].

Plaintiff testified that in 2012, the Board reported Mrs. Dervishi to the Department of Children and Families for educational neglect with referral to the Juvenile Court. [Tr. 3/16/17 at 146:5-9, see also Tr. 3/16/17 at 151:17-22 (plaintiff testifying that T.D. started "terrible behavior..."[h]e left the house. Many times he ran in the street. We called the police to find him."); 156:14-17 (plaintiff recounting two incidents when T.D. attempted to open the car door while she was driving in Manhattan); Pl. Ex. 42 at 2 (letter dated February 14, 2013 from Dr. Nancy O'Hara stating in part that T.D. "had a significant increase in aggression, agitation and out-of-control behaviors."); Pl. Ex. 42 at 3 (letter dated February 14, 2013 from Dr. Haydee Laneman stating in part that it was "impossible

to retrieve" an intravenous blood draw due to T.D.'s behavior during the procedure)]. On rebuttal, plaintiff argued that "the district has caused extremely serious damages to the child and huge gap that will make him to be dependent from others all his life when he has the ability and capacity to be independent adult."[27] [Doc. #132 ¶85]. However, the only remedy plaintiff sought was reimbursement for the time she provided home-based services to T.D. during the stay-put pendency.

No compensatory educational plan was proposed, and no current evidence was presented-such as academic reports, teacher evaluations, or parent testimony addressing educational deficiencies attributable to the failure to provide covered services pursuant to the stay-put 2009 Settlement Agreement. T.D. has now been enrolled at a private school in New York City since September 2016, being educated there with the support of the Board of Education. "[A] compensatory award fashioned by the [Court] must be the result of a 'fact-specific' inquiry that is 'reasonably calculated to provide the <u>educational benefits that likely would have accrued</u> from special education services the school district should have supplied in the first place.'" <u>Phillips</u>, 736 F. Supp. 2d at 248 (emphasis in original) (quoting

[27] Plaintiff also stated that during T.D.'s brief attendance at the Greenwich Education and Prep., LLC, he "did not learn anything, but only regressed and misbehaved." [Doc. #132 ¶46].

Reid, 401 F.3d at 524)); Doe, 790 F.3d at 457 ("[W]e leave to the district court whether compensatory education should be limited to the kinds of services specified in the amended 2008-2009 IEP, or encompass analogous educational services appropriate to the Student's current needs."). Plaintiff testified that that the parties agreed to an IEP for the 2016-2017 school year. Since September 2016, T.D. has been attending a private school in New York City from 8:45 AM to 5:00 PM and receiving intensive ABA programing for five hours per day. [Tr. 3/16/17 at 153:20-25, 156:10-14].

Without any evidence of discernible lost progress or a proposed compensatory education plan, there is no record on which to award any compensatory education for services that were not sought, not provided and may not be needed at this time. Phillips, 736 F.2d at 248 ("[t]he Court must be wary of mechanical calculations because a reasonable calculation of a compensatory award must be qualitative, fact-intensive, and above all tailored to the unique needs of the disabled student.")(citation and internal quotation marks omitted).

That said, this Court recognizes that given the potential availability of an equitable remedy for compensatory education, if T.D. can meet the evidentiary burden, his entitlement to this award should not depend on his parents' capacity to front the costs for pendency services. Once it is established that a child

is entitled to pendency stay-put services, the Court should provide the parties with additional time to supplement the record if there is insufficient evidence to support an award for compensatory education. See Phillips, 736 F.2d at 248 ("a Hearing Officer may provide the parties additional time to supplement the record if she believes there is insufficient evidence to support a specific award.")(citations and internal quotation marks omitted).

This Court's limited charge from the Court of Appeals was to "(i) calculate the total value of the home program, as specified in the settlement agreement, for the period from November 18, 2010 until the dispute over the 2010-2011 IEP is no longer pending, and (ii) order the Board to pay that amount to Dervishi." [Doc. #93 at 5]. That has been done; plaintiff is entitled to reimbursement in the total amount of $37,012.87.

If in light of this determination and T.D.'s progress at this current school placement, Mrs. Dervishi believes that the Board's failure to fund the pendency program has caused damage that can be ameliorated by compensatory services she should be given an opportunity first to seek it from the Board or, alternatively, to make that showing, preferably to a Hearing Officer whose expertise would assist in fashioning compensatory education tailored to his individual needs as the IDEA requires.

To be sure, it is conceivable that no compensatory education is required for the denial of pendency services because any alleged deficiencies suffered by T.D. have been mitigated, or totally alleviated, by his current private school placement. Given the Appeals Court's finding that the Board was responsible for funding T.D.'s existing educational placement during the pendency of the dispute, from November 18, 2010 through August 4, 2016, and evidence in the record[28] that T.D. may have suffered a setback in his educational development as a result of the unavailability of pendency funding, the Court concludes that plaintiff should not be precluded from seeking, and proffering evidence necessary to support, an award of compensatory education for T.D.

To award equitable relief in the form of compensatory education, the law will require a record of lost progress and/or

---

[28] Throughout these proceedings, Mrs. Dervishi has steadfastly argued that she provided ABA services as good as those rendered by professional qualified providers. By taking this position, she has eschewed any evidence or argument that, during the stay-put pendency period, T.D. experienced developmental and/or educational regression or lost progress. This raises the question whether Mrs. Dervishi's pro se advocacy for reimbursement precluded her from seeking prospective compensatory education because it conflicted with the value she placed on her services.

An alternative path is available. Plaintiff may simultaneously argue for prospective relief in the form of compensatory education to remedy any deprivations in T.D.'s education without waiving her right to continue to litigate on appeal for reimbursement, if she chooses. Or she may seek appointment of counsel to argue for compensatory education.

evidence to support such an award. Rowley, 458 U.S. at 207 ("The primary responsibility for formulating the education to be accorded a handicapped child, and for choosing the educational method most suitable to the child's needs, was left by the Act to state and local educational agencies in cooperation with the parents or guardian of the child."); N.R. ex rel. B.R. v. San Ramon Valley Unified Sch. Dist., No. C 06-1987 MHP, 2007 WL 216323, at *7 (N.D. Cal. Jan. 25, 2007)("[The parent] is not entitled to his choice of service providers. [] The Act requires only that the service provider be able to meet his needs."). There is no evidence as to T.D.'s current needs in this record.

"[T]he record in an IDEA case is supposed to be made not in the district court but primarily at the administrative level[.]" Reid, 401 F.3d at 527. The choice of methodology in providing special education services is the prerogative of the school district. See Rowley, 458 U.S. at 208. Should agreement not be possible, a Hearing Officer could develop a record with the information needed to determine and correct T.D.'s educational deficits, if any, and to fashion an appropriate award of compensatory education based on Stamford's failure to provide T.D. with the pendency stay-put services that were specified in the Settlement Agreement, i.e. speech, occupational therapy, ABA services and autism consulting services. Def. Ex. 500 ¶3.

CONCLUSION

For the reasons stated, defendant is ordered to reimburse plaintiff for stay-put services in the amount of $30,222.50 and stay-put transportation expenses in the amount of $6,790.37 together with interest at the rate set forth in 28 U.S.C. §1961(a) calculated from the date the Court of Appeals' Summary Order dated August 6, 2016. Streck v. Bd. of Educ. of the E. Greenbush Central School Dist., 408 F. App'x 411, 414-15 (2d Cir. 2010).

This is a recommended ruling. Any objections to this recommended ruling must be filed with the Clerk of the Court within fourteen (14) days of the receipt of this order. See 28 U.S.C. §636(b)(1); Fed. R. Civ. P. 6(a) & 72; Rule 72.2 of the Local Rules for United States Magistrate Judges, United States District Court for the District of Connecticut; Impala v. United States Dept. of Justice, 690 Fed. App'x 32 (2d Cir. 2016)(summary order)(failure to file timely objection to Magistrate Judge's recommended ruling will preclude further appeal to Second Circuit); cf. Small v. Sec'y of Health and Human Servs., 892 F.2d 15, 16 (2d Cir. 1989)(failure to file timely objection to Magistrate Judge's recommended ruling may

preclude further appeal to Second Circuit).

Dated at Bridgeport, this 19th day of April 2018.

_____/s/_____________________
HOLLY B. FITZSIMMONS
UNITED STATES MAGISTRATE JUDGE